Fecteau, J.
Plaintiff (“Carter”) brought the earlier-filed action, which now sounds in negligence, against the defendant (“Renaud”) asserting that Renaud shot him, which resulted in serious personal injuries. In the second suit, Renaud’s liability insurer (“Citation”) seeks a declaratory judgment which declares that it owes no duty to defend or indemnify Renaud because the shooting of Carter was not an “accident,” and/or that it was expected or intended by Renaud. These actions were merged for trial and both tried without a jury; the parties in the personal injury case waived their jury rights, and the second action was not triable to a jury as a matter of right. The cases were thus tried before me on March 2, 1999.
It is Carter’s contention that the resulting harm from the shooting was not intended by Renaud, notwithstanding the intentional nature of the act of firing a rifle. Renaud contends that Carter has not met his burden of proving that he was negligent, and/or that he was justified under G.L.c. 231, §85U.[1] Citation asserts that there are no facts present which allow for its policy of insurance to become answerible, or that would implicate its duty to indemnify Renaud.
Upon consideration of the evidence and the arguments of the parties, I make the following findings of fact, rulings of law and order for judgment.
FINDINGS OF FACT
1. At all times relevant to this proceeding, Gregory Renaud owned and lived at a residence located at 30 Phillips Passway, Fitchburg, Massachusetts. He was insured under a policy of homeowners insurance by Citation Insurance Company, with personal liability limits of $300,000.00.
2. During the fall of 1992, Gregory Renaud had become involved with illegal gambling as a bettor on football and basketball games. Through various means, including the use of the telephone and the use of “900" telephone numbers, he became introduced to John Carter, Bobby Vilático and Marco Zompetti, who were all involved on the bookmaking side of the operation.
3. By December 10, 1992, some disagreements had developed between Renaud, Carter and Zompetti concerning whether Renaud owed money due to lost bets, or whether he was ahead. On this same date, a meeting was held and attended by Renaud, Carter and Zompetti. At the meeting, the parties apparently worked out a peaceful resolution, although Renaud felt intimidated somewhat, especially by Carter.
4. On December 15, 1992, by prearrangement with Renaud, Carter and Zompetti went to Renaud’s place of employment at about 4:30 P.M. to discuss that weekend’s betting results; Carter and Zompetti went looking to collect about $8,000.00. Renaud, disagreeing with their figures, believed that he was owed money. After discussions, Carter and Zompetti left, and Renaud had the understanding that further discussions and meetings would take place, although nothing specific was arranged. Renaud left work about twenty to thirty minutes after Carter and Zompetti left. To the extent that both Carter and Zompetti testified that they were invited by Renaud to accompany him to and into his house where they would be paid from money he had there, they are disbelieved.
5. Renaud went home. No one else was there. He decided to light a wood stove, but noticed that there was not enough wood in the house to last the night. As a result, he went to retrieve wood from the wood pile outside. He then realized that the pieces of wood were frozen together, requiring the need to pry them apart with a tool, so he stepped into the shed. While inside the shed, he heard the screen door to his cellar slam.
6. The shed that Renaud was standing in was attached and built onto the rear wall of his home. He looked through a window from the shed into the cellar and saw Carter standing in the cellar. Zompetti had also entered the house and was in the cellar, although unseen by Renaud at this time. Carter and Zompetti had not lawfully entered the house. Renaud became frightened and retrieved a rifle, which was located in the rafters of the shed. Renaud then went back to the window. The rifle was loaded and a round was cham *172 bered. Carter was standing with his back to Renaud, who was holding the rifle in his right hand and with its barrel resting on the windowsill of the window. The rifle was pointed in the direction of Carter. Carter was standing approximately 8 to 15 feet away from Renaud in an illuminated room. They were at the same floor level.
7. Renaud yelled for Carter to get out of his house. He then saw Carter reach with his hand into the area of his rear waist. Fearing that Carter was reaching for a gun, Renaud pulled the trigger and moved down and to his side. Another shot was fired, narrowly missing Zompetti. The shots were not fired accidentally. Renaud intended to pull the trigger and did so. He did so out of fear for his own safety. He had not actually seen Carter display any weapon, nor did he wait to see what Carter was reaching for. Carter was hit by the first shot in the back of the head.
8. Renaud then heard the door slam again. He cautiously looked out the shed door and saw Zompetti running down the driveway. Renaud then retrieved a higher-powered rifle and chased him a short distance on foot until he saw Zompetti standing near a neighbor. Renaud then threw the rifle into the cab of his pick-up truck, which was parked nearby. He returned to his home and called “911.” Police and medical assistance arrived. Carter suffered serious injuries, including some permanent neurological damage. Apart from questions of liability, Carter’s damages would exceed the available limits of coverage.
9. Renaud was a firearms expert. He was in good health, was not under the influence of any substance or illness, physical or emotional. Although he had not brought the rifle up to the usual firing position to allow for sighting down the barrel by eye, he knew that he was pointing the rifle at Carter. Carter was standing directly in front of Renaud, about 8 to 15 feet away, in full view, facing away from Renaud, and in a lit room. Carter is approximately 6 feet tall and, at the time, weighed approximately 230 lbs. Renaud knew that the safely had been disengaged, and that the rifle was loaded with a round in the chamber. He knew that if he fired the rifle in that position, he was likely to hit and thereby injure Carter. Renaud was substantially certain, I infer, that Carter would be hit and thereby injured, although he may not have known the extent to which Carter would be injured. To the extent that Renaud testified that he did not intend to hurt Carter, he is disbelieved.
10. Renaud filed for personal bankruptcy on February 19, 1995. On June 13, 1995, a partied lifting of the automatic stay of proceedings was granted by the Bankruptcy Court to the extent of available liability insurance.
RULINGS OF LAW
It has been recognized that “the legal definitions of the word ‘intent’ or ‘intentional’ vary depending on the area of law at issue.” Preferred Mutual Ins. Co. v. Gamache, 42 Mass.App.Ct. 194, 199 n.7 (1997). These cases present the subtle distinction surrounding the use of the word “intentional” in two contexts. The first context involves the case between Carter and Renaud, which concerns the liability issue of whether Renaud’s conduct was negligent or intentional. The second context involves Citation’s claim, which concerns the coverage issue of whether the bodily injury to Carter was accidental or intentional. I address the liability case first.
Carter alleges that Renaud was negligent in shooting him. Negligence implies carelessness, while intent implies purposefulness. Had Renaud been carrying a loaded rifle that discharged when he tripped, or fell, or through some other accidental agency or force, he would be negligent. Here, none of those events occurred. He knew that he was pointing a loaded rifle in the direction of Carter and consciously, voluntarily and purposefully pulled the trigger. As such, I infer that he intended to shoot Carter. He was not negligent. An intentional act cannot be negligent. See Waters v. Blackshear, 412 Mass. 589, 590 (1992). Furthermore, even if Renaud was acting in self-defense (and even if he was not reasonable in his belief that he was about to be assaulted, or he was reasonable in his belief of an imminent assault, but used excessive force) this does not transform the conscious and deliberate act of firing a weapon into a negligent act. Accordingly, Carter has failed to satisfy his burden of proving that the actions of Renaud were negligent.
Turning then to Citation’s claims, and notwithstanding a finding of no liability on the part of its insured (Renaud), the issue remains as to whether the bodily injury sustained by Carter is an event covered under the insurance policy. Under the homeowners insurance policy insuring Renaud, Citation is contractually obligated to defend and indemnify him for the following:
SECTION II — LIABILITY COVERAGES:
Coverage E — Personal Liability: If a claim is made or a suit is brought against an insured for damages because of bodily injury . . . caused by an occurrence to which this coverage applies, we will:
1. pay up to our limit of liability for the damages our insured is legally liable; and,
2. provide a defense . . .
An “occurrence” is defined within the policy definitions as “an accident, including exposure to conditions, which result, during the policy period, in .. . bodily injury; . . .”
The insurance policy also contains an exclusion, which Citation argues is applicable to this case. The exclusion provides that “Coverage E — Personal Liability .. . do[es] not apply to bodily injury which is expected or intended by the insured;.. .” Therefore, if Carter’s bodily injury was not the result of an “accident,” or was “expected or intended” by Renaud, then coverage does not apply.
*173 An “accident” has been defined as “an unexpected happening without intention or design.” Quincy Mutual Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83 (1984). Quincy Mutual was the first of a new line of cases which interpreted the policy and exclusion language that is at issue in this case. With regard to this policy language, the court stated that “the resulting injury which ensues from the volitional act of an insured is still an ‘accident’ within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur.” Id. at 84. Thus, the “focus in these cases is whether the insured ‘intended’ the injury, not whether the insured ‘intended’ the act. Of course, the insured need not intend to cause the precise injury which occurred for the exclusion to apply.” Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 784 (1992), citing Newton v. Krasnigor, 404 Mass. 682, 686 (1989).
Here, there is no question that Renaud intended the act. Accordingly, I find that he did. The next question is whether he intended the injury. I also find that he did. Under the circumstances presented by the facts, there is no evidence to support any other conclusion, other than his own statement, that he did not intend to harm Carter. There is no evidence that he intended to fire a warning shot, or to miss hitting Carter. Renaud was in fear that Carter was reaching for a weapon. He fired while the rifle was pointing at Carter, and before Carter was even able to produce what, if anything, he was reaching for. Renaud acted presumptively and with substantial certainty that he would hit and injure Carter. It was no accident. Accordingly, Citation does not have to answer for this event.
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment enter for the defendant in Civil Action No. 94-00341, and that judgment enter for the plaintiff in Civil Action No. 94-02254.

 G.L.c. 231, §85U (1998 ed.) provides, in pertinent part, that “(n]o person who is a lawful occupant of a dwelling shall be liable in an action for damages for death or injuries to an unlawful occupant of said dwelling resulting from the acts of said lawful occupant; provided, however, that said lawful occupant was in the dwelling at the time of the occurrence and that he acted in the reasonable belief that the person unlawfully in said lawful dwelling was about to inflict great bodily injury or death upon said occupant..., and that said lawful occupant used reasonable means to defend himself